Opinion by
Wright, J.,
Margaret Mary Imhoff and her husband, Paul Imhoff, filed a complaint in trespass against the City of Pittsburgh to recover damages for personal injuries sustained by the wife-plaintiff on the afternoon of January 3, 1957, when she slipped and fell while walking along Pliney Way. The case was tried before Honorable Ruggero J. Aldisert and a jury. The defendant called no witnesses, but presented a point for binding instructions, which point was refused. The jury returned a verdict in favor of the wife-plaintiff in amount of $1,200.00, and a verdict in favor of the husband-plaintiff in amount of $500.00. The court en banc subsequently entered judgments in favor of the defendant non obstante veredicto. The plaintiffs have appealed.
Appellants resided at No. 712 Pliney Way, which is a narrow unimproved street without sidewalks. It *234 is referred to in the. opinion below as “a back street or alley”. The wife-appellant was returning from a brief visit to the home of her mother-in-law, who also resided on Pliney- -Way about a block distant. The complaint alleges, that the wife-plaintiff “was caused to fall by reason of ridges of ice covering ruts in the said cartway, said condition having existed for a long period of time after the defendant knew, or in the exercise of reasonable care, should have known of their existence”. Since the sole, question- on this appeal is whether appellants established negligence on the part of the city, we will set forth the material portion of the testimony of appellants’ three witnesses on that pivotal issue.
Margaret Mary Imhoff testified as follows: “Q. And what happened to you? ' A.' I was-walking along Pliney Way, and I slipped and fell. Q. Do you know what caused you to slip and fall? A. .There had been an accumulation of ice, and it had formed into ridges and ruts, and there was nowhere to walk and I slipped in one of these. Q. D.o you know approximately how long this condition had existed on Pliney Way? A. The ice and ridges had been there for at least three weeks, possibly longer. Q. Could you describe for us this accumulation — this condition? A. Well, as it had snowed and melted, the snow would melt in certain places and accumulate in others, and then as it would snow again this ice would just, keep. on, accumulating and formed into ridges. Q, .Could..you tell Us anything about the size of the ridges? A. The ridges were at least five inches deep with, I would say, a cap, of at least three inches of ice”. •
Joseph Yasinsky testified as -follows: “Q. Now, are you familiar with the condition of Pliney Way as it existed at the time of January 3, 1957? A. Yes, I remember the condition. It was icy and furrowed with ridges, and they ran unevenly across the road or down, *235 and they were there for quite a while, and that was a common thing. When winter set in, some of the ice melted, some of the ice did not melt,- snow came down freezing over unevenness, causing the ridges and the furrows. Q. And could you say approximately how long this condition had existed prior to January 3, 1957? - A. I imagine about four weeks or so. Q. Could you tell us anything about the size of these ridges— anything about their dimensions? A. Some were pretty — I don’t know if you call them high or deep — either one. A ridge would be high — I’d say five or six inches. They varied, one inch, two inches, as you went along”.
Marie B. Brickner testified as follows: “Q. Are you familiar with the condition of Pliney Way as it existed on January 3, 1957 . . . ? A. Yes, I am. Q. Now, would you describe the condition as it existed with particular reference to this area of Pliney Way? A. There were ruts. It was ice that would. form in those ruts, and then during the day that would thaw, and naturally if we got any snow that would cover that, and it’s hard to see that ice with that snow over top . . . Q. Could you tell us anything about the sizq or dimension of these ridges? A. Well, I’d say they’d be three to five inches in depth and width. Q. Now, could you tell us approximately how long prior to January 3, 1957, that this condition existed? A. Oh, approximately three or four weeks”.
It is apparent from the foregoing testimony that two important factors are present in the instant case. In the first place, the fall occurred in the cartway of a street, not on a sidewalk. In the second place, there was no testimony whatsoever that the hills and ridges in the cartway resulted from other than natural weather conditions. It is settled law that the duty of a municipality to keep its sidewalks free from snow and ice does not apply in the same degree to the surface of the street, and that there is no liability on the municipali *236 ty if the injury results solely from natural weather conditions. These principles are set forth in McQuillin on Municipal Corporations, 3rd Edition, Volume 19, Sections 54.65 and 54.79, as follows:
“In northern states, and wherever there is snow and freezing weather, many persons are injured by slipping on the ice or snow either on the sidewalk, the driveway or a crosswalk. In determining the liability of the municipality, it is generally important to distinguish according to the place of the injury, i.e., as to whether it was on the driveway, sidewalk, or a crosswalk, because apart from statute, a much less stringent liability exists with reference to snow on crosswalks and roadways than upon a sidewalk. The duty of a municipality to keep its sidewalks free from snow and ice does not, in the absence of some express provision of statute, apply to the same extent to a crosswalk or on a public street . .
“In those sections where a greater or less amount of snow falls in the winter season, there is generally, from the first snowfall until a general thaw in the spring, more or less snow and ice on all the streets in every municipality . . . And it is not true that whatever a municipality must do relative to snow and ice on á sidewalk it must also be required to do with reference to snow and ice in the driveway. So it is hardly necessary to state that it is not the duty of municipalities to exercise ordinary care to keep the driveway of its streets, from curb to curb, free from snow and ice; and if persons or animals slip thereon, the municipality is ordinarily not liable, where the snow or ice results from natural causes”.
In Strauch v. Scranton, 157 Pa. Superior Ct. 174, 42 A. 2d 96, affirmed 353 Pa. 10, 44 A. 2d 258, surface water alternately froze and thawed in the roadway of Moltke Avenue in the City of Scranton, and ruts were formed in the ice. There were no sidewalks, and the *237 street itself was commonly used by pedestrians as a footway. Strauch was injured in a fall on the ice. Judgment on a verdict in his favor was reversed by this court in an opinion by the late Judge Hirt, who said: “A city is held to no higher duty than to keep its streets in a reasonably safe condition for use, considering the ordinary requirements of the general public ... and climatic conditions which make it impossible for any city to keep its roadways free from ice at mil times ... A slippery condition from an accumulation of ice which is general is not sufficient in itself to'impose liability either on a property owner, or on a city ... A city however may be responsible for injury resulting from an artificial accumulation of ice, as distinguished from that resulting from natural surface drainage”.
In Solinsky v. Wilkes-Barre, 375 Pa. 87, 99 A. 2d 570, the wife-plaintiff fell on Reno Lane in the City of Wilkes-Barre. The factual situation therein presented was strikingly similar to that in the case at bar. Reno Lane was fifteen feet wide, unpaved, and had no sidewalks. It was used by both vehicular and pedestrian traffic. The negligence charged against the city was its failure to maintain the street in a safe condition after constructive notice of the existence of ruts and ridges of ice in the roadway. The lower court refused, to take off a nonsuit, and entered judgment for the defendant. In affirming, our Supreme Court quoted at length from the Strauch case and then made the following significant statement: “A distinction exists between a situation created by a natural cause and one arising artificially, i.e., such as results from overflow: ing drains, sewers, dripping eaves, et cetera. Should a street become unsafe because of a dangerous accumulation of ice and snow following a sewer stoppage (artificial cause) of which the city had actual or constructive notice, the municipality may become liable *238 for injuries sustained by a pedestrian . . . Tbe injury here complained of took place in a street”.
Appellants argue that the conditions which were allegedly hazardous in the Strauch and Solinsky cases had existed for only a few days, whereas the ruts and ridges in the instant case had been in existence for several weeks. We are not persuaded by this attempted distinction. It appears from the opinion in each of the cases cited that the condition had existed long enough to charge the municipality with constructive notice, so that the time element was not considered to be a material factor. We do not intend to indicate in this opinion that prompt snow removal is not a desirable practice. However, we agree with the court en banc that appellants failed to establish negligence on the part of the municipality in the case at bar.
Judgment affirmed.